UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE PINEDA,<br><br>                          Plaintiff,<br><br>             -against-<br><br>DUTCHESS COUNTY, SHERIFF KIRK<br>IMPERATI, OFFICER ARROYO,<br>SERGEANT LAMONICA, and FRANK<br>TORRE,<br><br>                        Defendants. | 25-CV-4554 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Jose Pineda, who is proceeding pro se, spent seven days incarcerated at the Dutchess County Jail in early May of last year. Pineda is Jewish and "observes kosher dietary laws as a fundamental tenet of his faith." But during six of the seven days he spent in jail, he was denied access to kosher meals. Instead, jail officials provided Pineda with non-kosher food—which he did not eat. As a result, Pineda experienced "significant physical effects including extreme hunger, weakness, dizziness, and weight loss," as well as "severe emotional distress, humiliation, and spiritual anguish from being forced to choose between violating his religious beliefs and going without food."

Now released, Pineda brings this action against Dutchess County, Dutchess County Sheriff Kirk Imperati, and several jail officials. He asserts claims under the First and Eighth Amendments, as well as a claim for municipal liability. Defendants move to dismiss all of Pineda's claims. Because Plaintiff failed to state claims against the County and Sheriff Imperati, the Court dismisses the claims against these defendants. All other claims survive for the reasons stated below.

**BACKGROUND**

The following facts are, unless otherwise noted, taken from the Amended Complaint ("AC"), ECF No. 34, and presumed to be true for the purposes of this motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

Plaintiff Jose Pineda ("Pineda") was incarcerated at the Dutchess County Jail from May 8, 2025, until May 14, 2025. ¶ 14. Pineda is a practicing Jew who "observ[es] kosher dietary laws as a fundamental tenet of his faith." ¶ 13. But for six of the seven days he was incarcerated, jail officials denied him access to kosher meals. ¶ 2. When Pineda was provided non-kosher food, he did not consume it. ¶ 19. As a result, Pineda experienced "significant physical effects including extreme hunger, weakness, dizziness, and weight loss," as well as "severe emotional distress, humiliation, and spiritual anguish from being forced to choose between violating his religious beliefs and going without food." ¶¶ 33–34.

During his intake, Pineda told jail officials that he was a practicing Jew who needed kosher meals to comply with his religious observance. ¶ 15. The nurse on duty acknowledged Pineda's religious dietary requirements and confirmed that she would note them. ¶ 16. However, other intake employees—relying on old records—identified Pineda as a Catholic. ¶ 17. For the next six days, from May 8, 2025, through May 13, 2025, Pineda did not receive kosher meals. ¶ 18.

Pineda tried to fix the problem by speaking with multiple other jail officials, including Sergeant LaMonica ("LaMonica"). ¶ 20. But LaMonica refused to correct the error. ¶ 21. LaMonica insisted that the jail had conducted the intake properly. *Id.* Accordingly, Pineda's religious identification remained unchanged—and he continued to receive non-kosher meals. *See id.* He continued to not eat them. ¶ 19.

Approximately four days after his intake, Pineda began to feel lightheaded, weak, and dizzy. ¶ 23. He requested medical attention. ¶ 24. The nurse who had conducted his intake again "confirmed his religious dietary need for kosher meals"—this time in front of LaMonica. ¶ 25. Another jail official, Officer Arroyo ("Arroyo"), was also present for Pineda's medical evaluation. ¶ 27. According to the Amended Complaint, Arroyo told Pineda that he "would love to see [Pineda's] health take a downhill turn and to be the one responsible." *Id.* Arroyo warned Pineda to stay on his bunk and to "shut the fuck up." ¶ 28. These threats made Pineda "feel unsafe and effectively deterred him from seeking further medical" assistance. ¶ 29. Pineda continued to receive only non-kosher meals. ¶ 26.

On May 12, 2025, transport officers noticed Pineda's condition and encouraged him to seek medical attention. ¶ 30. One of those officers, Officer Correro ("Correro"), also tried to help Pineda get kosher meals. ¶ 31. But LaMonica discouraged Correro and implied that further efforts to get Pineda kosher meals "would not be supported." *Id.*

Two days later, on May 14, 2025, Pineda finally received his first kosher meal. ¶ 32. It was his last day in jail. *Id.* In total, Pineda spent six of his seven days incarcerated without kosher food. ¶¶ 1–2.

Not long after his release, on May 27, 2025, Pineda filed this lawsuit. ECF No. 1. He asserts claims under 42 U.S.C. § 1983 ("Section 1983") for violations of the First Amendment Free Exercise Clause, the Eighth Amendment, and for *Monell* liability.[1] ECF No. 1 ¶¶ 36–56. He seeks a declaratory judgement that Defendants violated his First and Eighth Amendment rights; compensatory damages for his "pain, suffering, emotional distress, humiliation, and harm

---

[1] That same day, Pineda also filed a companion lawsuit challenging the constitutionality of his detention. *See* Complaint, *Pineda v. Sutherland*, No. 25-CV-4552 (JGLC) (S.D.N.Y. May 27, 2025), ECF No. 1.

to religious exercise;" punitive damages against Defendants Arroyo and LaMonica in their individual capacities; and injunctive relief directing Dutchess County and the Sheriff's Office to, among other things, implement training about religious dietary accommodations and new policies prohibiting retaliation against incarcerated individuals who request medical care. AC at 10.

On August 26, 2026, Defendants Dutchess County, Sheriff Kirk Imperati ("Imperati"), Officer Arroyo, and Sergeant LaMonica (collectively, the "County Defendants" or "Defendants") moved to dismiss. ECF No. 20. They argue that, as a threshold matter, Pineda failed to exhaust his administrative remedies and is thus barred from challenging the conditions of his confinement under the Prison Litigation Reform Act ("PLRA"). ECF No. 23 ("MTD") at 4–5. On the merits, they assert that Pineda has failed to state all three of his claims.[2] *Id.* at 5–14. The County Defendants also contend that the "Individual Defendants"—Imperati, Arroyo, and LaMonica—were not personally involved in the constitutional violations Pineda alleges. *Id.* at 15–17. And they argue that the Individual Defendants are entitled to qualified immunity. *Id.* at 17–18.

When Pineda first filed his Complaint, he also alleged a claim against a man named "Frank" who worked in the jail's Food Services Division. ECF No. 1 ("Compl.") ¶ 12. Pineda contended that Frank "refused or failed to act on confirmed dietary instructions" to provide

---

[2] The County Defendants improperly include and rely upon the jail's own "logs" to support their arguments. *See* ECF No. 22-2. The Court does not consider these records because they fall outside of the complaint. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021) (quoting *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000)) (explaining that a district court "errs when it consider[s] affidavits and exhibits submitted by defendants . . . in ruling on a 12(b)(6) motion to dismiss."). Although Pineda's Amended Complaint refers to jail officials' notes, and to his own requests that jail officials take those notes, the jail's internal records are hardly "integral" to Pineda's pleadings. *See id.* (noting that external documents are "considered 'integral' to the complaint in a narrow set of circumstances").

Pineda with kosher meals, even after Pineda tried to "escalate the issue." ¶ 22. Defendants' counsel later identified Frank as a man named Frank Torre. *See* ECF No. 19. Once "Frank's" identity was known, Pineda amended his Complaint to include Frank Torre as a named Defendant. *See* AC at 1. Pineda's Amended Complaint, which the Court construes to be the operative complaint in this case, asserted identical claims against the County Defendants. *See generally* AC. Recently, Frank Torre also moved to dismiss this case. ECF No. 41. However, because Torre's motion has not yet been fully briefed, the Court does not address it here. The County Defendants, meanwhile, renewed their motion to dismiss Pineda's Amended Complaint, relying on their initial filings. *See* ECF No. 37. The Court addresses the County Defendants' motion to dismiss below.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). This is especially so in pro se cases, where "courts read pro se filings 'to raise the strongest arguments that they suggest.'" *Anderson Bey v. Roc Nation LLC*, No. 1:24-CV-02295 (ALC), 2025 WL 564248, at *1 (S.D.N.Y. Feb. 20, 2025) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for

5

relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## DISCUSSION

This discussion proceeds in seven parts. First, the Court analyzes whether the PLRA bars Pineda's claims and finds that the statute does no such thing. Second, the Court evaluates Pineda's First Amendment Free Exercise claim and concludes that he states that claim. Third, the Court finds that Pineda plausibly alleges deliberate indifference claims under the Eighth or Fourteenth Amendment. But, fourth, the Court concludes that Pineda does not sufficiently plead a claim for *Monell* liability. Fifth, the Court assesses whether Pineda pleads sufficient facts to demonstrate that the Individual Defendants were personally involved in the constitutional violations he alleges. The Court concludes that he has sufficiently alleged that Arroyo and LaMonica, but not Imperati, were personally involved. Sixth, the Court concludes that neither Arroyo nor LaMonica are entitled to qualified immunity. And lastly, the Court *sua sponte* denies Pineda leave to further amend his complaint.

## I.    The PLRA Does Not Bar Pineda's Claims

As an initial matter, Defendants' argument that the PLRA bars Pineda's claims is without merit. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,'" or allege excessive force,

6

the denial of adequate medical care, or some other wrong. *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). To exhaust administrative remedies under the PLRA, an incarcerated individual must "'complete the administrative review process in accordance with the applicable procedural rules' – rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

However, the PLRA's exhaustion requirement applies only to "prisoner[s] confined in any jail, prison, or other correctional facility"—not to individuals who sue after they have been released from confinement. 42 U.S.C. § 1997e(a); *see also Morris v. Eversley*, 205 F. Supp. 2d 234, 241 (S.D.N.Y. 2002) (citing *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) (holding that litigants "who file prison condition actions after release from confinement are no longer 'prisoners' for [the] purposes of § 1997e(a) and, therefore, need not satisfy [its] exhaustion requirements")). Indeed, the Second Circuit has long made clear that "[t]he relevant time at which a person must be 'a prisoner' within the meaning of the PLRA in order for the Act's restrictions to apply is 'the moment the plaintiff files his complaint.'" *Jones v. Cuomo*, 2 F.4th 22 (2d Cir. 2021) (quoting *Gibson v. City Mun. of N.Y.*, 692 F.3d 198, 201 (2d Cir. 2012)). Because Pineda was released from the Dutchess County Jail on May 14, 2025, then filed this action after his release, on May 27, 2025, the PLRA's exhaustion requirements do not apply and the statute does not bar his claims. AC ¶ 14; ECF No. 1.

Moreover, "PLRA exhaustion is an 'affirmative defense,'" not a "pleading requirement": plaintiffs "are not required to specially plead or demonstrate exhaustion in their complaints." *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (quoting *Jones*, 549 U.S. at 212, 216). Pineda need

not have pled, as Defendants suggest, that he filed a grievance or appealed any denial of his complaints. *See Perttu*, 65 U.S. at 469; *Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); *cf.* MTD at 5. The PLRA therefore does not bar Pineda's claims on multiple grounds.

## II.    Pineda Plausibly States a First Amendment Free Exercise Claim

Turning to the merits, the Court first addresses Pineda's claim under the First Amendment Free Exercise Clause. AC ¶¶ 36–42. "The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (quoting U.S. Const. amend. I). Its protections do not stop at a prison's walls; incarcerated people "have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)).

"In the prison context, however, 'the right to free exercise of religion' is balanced against 'the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Kravitz v. Purcell*, 87 F.4th 111, 127–28 (2d Cir. 2023) (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). "Therefore, an infringement of the free exercise of religion is permissible only if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To evaluate a free exercise claim, then, "a court must assess "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison

8

officials furthers . . . legitimate penological objective[s]." *Kravitz*, 87 F.4th at 128 (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

The Second Circuit has also recently made clear that "[i]n the context of a § 1983 claim for a violation of the First Amendment, there is no requirement to show that the governmental burden on religious beliefs was 'substantial.'" *Id.* at 127. "Rather, a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* (internal citations and quotation marks omitted); *see id.* at 124 (explaining that, since 1990, "the Supreme Court has treated a showing of the plaintiff's sincerity to be sufficient to establish a *prima facie* free exercise violation and has not referenced a substantial burden requirement") (citing *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Fulton*, 593 U.S. at 523; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–47 (1993); *Emp. Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872, 879–81 (1990)).

The substantial burden requirement led to a long "line of troubling decisions," the Second Circuit explained, because it ushered courts into the "misguided enterprise" of "measuring the devotional import of certain religious practices." *Kravitz*, 87 F.4th at 125 (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004)) (cleaned up). But "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," the Circuit has cautioned. *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r,* 490 U.S. 680, 699, (1989)). Courts must "resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." *Id.* at 201.

9

Here, then, the application is straightforward. Pineda is a self-described "practicing Jew" who observes "kosher dietary laws as a fundamental tenet of his faith." AC ¶ 13. He affirms that his "Jewish faith and observance of kosher dietary laws constitute sincerely held religious beliefs." *Id.* ¶ 39. Defendants' repeated decisions to withhold his kosher meals for a prolonged period of time—six days—doubtless infringed upon his religious beliefs. *See id.* ¶¶ 18, 21, 26–28, 31, 40. And Defendants offer no legitimate penological objectives to justify their actions. *See* MTD at 5–7; ECF No. 30 ("Reply") at 1–2. As alleged, Defendants targeted Pineda individually and for no reason; they were not acting pursuant to a "neutral" or "generally applicable" policy. *See Kravitz*, 87 F.4th at 127.

Defendants respond by mistakenly relying on cases that undertake the "misguided enterprise" of "measuring the devotional import of certain religious practices." *Id.* at 125; *see* MTD at 6–7 (citing *Washington v. Afify*, 968 F. Supp. 2d 532, 537–38 (W.D.N.Y. 2013); *Lewis v. Zon*, 920 F. Supp. 2d 379, 385–86 (W.D.N.Y. 2013); *Jean-Laurent v. Los*, No. 12-CV-132 (S) (F), 2015 WL 1015383, at *6–7 (W.D.N.Y. Mar. 9, 2015); *Odom v. Dixon*, 04-CV-889 (F), 2008 WL 466255, at *10–12 (W.D.N.Y. Feb. 15, 2008); *Thomas v. Picio*, 04-CV-3174 (KMW) (RLE), 2008 WL 820740, at *6 (S.D.N.Y. Mar. 26, 2008); *Peterson v. Price*, 06-CV-106 (FS), 2007 WL 2893009, at *6 (N.D.W. Va. Sept. 28, 2007)). These cases, which largely hail from outside of this District and require plaintiffs to demonstrate that they are suffering a "substantial burden" on their religious beliefs, are inapposite. *See Kravitz*, 87 F.4th at 125. Because Pineda alleges "that his sincere religious beliefs were burdened," and Defendants provide no legitimate penological justification for their actions, "that is enough[.]" *Id.* at 129.

Pineda's First Amendment Free Exercise claim survives Defendants' motion to dismiss.

10

### III.    Pineda Plausibly Alleges Deliberate Indifference Under the Eighth or Fourteenth Amendment

Next, the Court considers Pineda's allegations regarding his conditions of confinement, which he styles as an Eighth Amendment claim and levies only against Arroyo and LaMonica. AC ¶¶ 43–50. First, the Court sets out the general standards that govern such claims. Then, it analyzes what it construes as Pineda's two specific allegations, that: (1) being deprived of food for six days constituted cruel and unusual punishment, and (2) Defendants were deliberately indifferent to his attendant medical issues as a result of the lack of food. The Court denies Defendants' motion to dismiss as to both challenged conditions.

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting U.S. Const. amend. VIII). "To demonstrate that the conditions of [one's] confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). The plaintiff "must allege that: (1) objectively, the deprivation [he] suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety.'" *Walker*, 717 F.3d at 125 (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)); *see id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (explaining that "conditions of confinement may not 'involve the wanton and unnecessary infliction of pain'")).

The Supreme Court has extended these protections "to pretrial detainees under the Due Process Clause of the Fourteenth Amendment, reasoning that 'the due process rights of a person [detained but not convicted] are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *City of*

11

*Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "Plaintiff does not explicitly state in the Amended Complaint whether he is a detainee or inmate." *McCray v. Westchester Cnty.*, No. 18-CV-3494 (NSR), 2021 WL 5597158, at *4 (S.D.N.Y. Nov. 30, 2021). "Regardless of his classification, however, the Constitution requires that prison officials 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

The objective test is the same under both the Eighth and Fourteenth Amendments. *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017). To meet the objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* (citation omitted). This unreasonable risk to health includes "the risk of serious damage to physical and mental soundness." *Id.* (cleaned up). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (cleaned up). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Conditions of confinement may also be "aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Darnell*, 849 F.3d at 30 (quoting *Walker*, 717 F.3d at 125).

The subjective test differs, however, between the Eighth and Fourteenth Amendments. Under the Eighth Amendment, to "meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" *Walker*, 717 F.3d at 125 (internal citation omitted). "'[T]he prison official must know of, and disregard, an excessive risk to inmate health

12

or safety.'" *Id.* (internal citation omitted); *see also Jolly*, 76 F.3d at 481 (explaining that deliberate indifference is "the subjective prong of the Eighth Amendment inquiry").

Under the Fourteenth Amendment, by contrast, the subjective element is "more properly considered a *mens rea* prong that requires a showing of recklessness, which is defined objectively." *Strange v. Westchester Cnty. Dep't of Corr.*, No. 17-CV-9968 (NSR), 2018 WL 3910829, at *3 (S.D.N.Y. Aug. 14, 2018) (citing *Darnell*, 849 F.3d at 32, 35). Someone who is detained pretrial must therefore plead facts that demonstrate "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee[—]even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Because this standard is "defined objectively," it "can be violated when an official does not have subjective awareness that the official's acts . . . have subjected the pretrial detainee to a substantial risk of harm." *Id.*; *see also McCray*, 2021 WL 5597158, at *4.

## A. Pineda's Claim Regarding Food Deprivation Survives

Construing the Amended Complaint "liberally to raise the strongest arguments it suggests," the Court finds that Pineda sufficiently states a claim under either the Eighth or Fourteenth Amendment based on the allegations that the jail effectively deprived him food for several days. *Walker*, 717 F.3d at 124 (cleaned up). Although "courts in this Circuit have held that being denied a single meal does not give rise to a constitutional deprivation," *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016), "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension," *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.

13

1983); *see also Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (quoting *Robles*, 725 F.2d at 15) ("'[A] substantial deprivation of food' can cause serious physical harm sufficient to find cruel and unusual punishment[.]").

The Constitution "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983) (cleaned up). So when food does present such a danger—either because it cannot be safely consumed or because prison officials have withheld it—courts in this Circuit have allowed plaintiffs' claims to proceed. *See, e.g.*, *Willey v. Kirkpatrick*, 801 F. 3d 51, 69 (2d Cir. 2015) (finding plaintiff's allegations that he was routinely served stale bread and rotten cabbage as part of a restricted diet sufficient to state a facially plausible claim under the Eighth Amendment); *Phelps v. Kapnolas*, 308 F.3d 180, 186–87 (2d Cir. 2002) (reversing district court's decision dismissing plaintiff's Eighth Amendment claim that prison officials deprived him of a nutritionally adequate diet for fourteen straight days); *Colson v. Mingo*, No. 18-CV-2765 (JGLC), 2024 WL 1018582, at *14 (S.D.N.Y. Mar. 8, 2024) (denying summary judgment where plaintiff was deprived of food and water for at least fifteen hours, was deprived of medication and medical care, and experienced "severely unsanitary conditions"); *McCray v. Westchester Cnty.*, 2021 WL 5597158, at *5 (collecting cases) (plaintiff's allegations that he was served rotten and stale food, resulting in nausea, vomiting, significant weight loss, and mental health issues, were sufficient to pass the objective prong under both the Eighth and Fourteenth Amendments); *Salgado v. DuBois*, No. 17-CV-6040 (NSR), 2019 WL 1409808, at *10 (S.D.N.Y. Mar. 28, 2019) ("rotting and insect-infested food" satisfied the objective prong)

14

Here, Pineda alleges that Arroyo and LaMonica's actions, taken together, had the "mutually enforcing effect" of depriving him of food for six days. *Darnell*, 849 F.3d at 30; AC ¶¶ 32–34, 46–49. That deprivation—of a "single, identifiable human need"—is enough to meet the objective prong under both the Eighth and Fourteenth Amendments. *Darnell*, 849 F.3d at 30; *see Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (cleaned up) ("We have held that prisoners may not be deprived of their basic human needs—*e.g.,* food . . . ."). Pineda has also sufficiently alleged that he suffered a "distinct and palpable injury" as a result of that deprivation. *McCray*, 2021 WL 5597158, at *5 (quoting *M.F. v. Reish*, No. 95-CV-4904 (SAS), 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996)). "Going without food for multiple days created a serious medical need," he alleges, "including extreme hunger, weakness, dizziness, and weight loss," as well as "severe emotional distress, humiliation, and spiritual anguish from being forced to choose between violating his religious beliefs and going without food." AC ¶¶ 33–34, 45. These "risk[s] of serious damage to [his] physical and mental soundness" are sufficient to, at this stage, move his claim forward. *Darnell*, 849 F.3d at 30 (internal citation and quotation marks omitted).

Pineda's allegations are also sufficient to meet the subjective prong under both the Eighth and Fourteenth Amendments. According to the Amended Complaint, Arroyo and LaMonica knew of and disregarded the excessive risks to Plaintiff's health and safety, or recklessly failed to act with reasonable care to mitigate those risks once they knew about them. *See* AC ¶¶ 27, 31, 47, 48. Therefore, Pineda's food-related conditions of confinement claim survives Defendants' motion to dismiss.

## B. Pineda's Medical Indifference Claim Survives

The Court now turns to the other basis for Pineda's conditions of confinement claim: that Arroyo and LaMonica were deliberately indifferent to his medical needs. Medical indifference

15

claims follow a similar rubric to food-related conditions of confinement claims. First, the "alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (quoting *Farmer*, 511 U.S. at 834) (internal quotations omitted). "In determining the seriousness of a medical condition, courts look to certain factors, including: (1) 'whether a reasonable doctor or patient would find [it] important and worthy of comment'; (2) 'whether the condition significantly affects an individual's daily activities'; (3) 'and whether it causes chronic and substantial pain.'" *Randle v. Alexander*, 960 F. Supp. 2d 457, 480 (S.D.N.Y. 2013) (quoting *Salahuddin*, 467 F.3d at 280).

Second, the plaintiff must satisfy the subjective element—demonstrating "that the defendant acted with 'deliberate indifference.'" *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020). "Deliberate indifference under the Eighth Amendment standard means the official must know of and disregard an excessive risk to inmate health or safety." *Id.* (cleaned up). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The Supreme Court has long held, for instance, that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment[] . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Darby*, 14 F.4th at 128 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

"[A] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs," meanwhile, "can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the

16

defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019).

Here, too, Pineda's claim passes muster. Again "accepting all factual allegations in the [Amended Complaint] as true, and drawing all reasonable inferences in the plaintiff's favor," *Goldstein*, 516 F.3d at 56, Pineda has stated a claim for medical indifference under the Eighth or Fourteenth Amendment. As an initial matter, Pineda has sufficiently alleged that the claimed deprivation of medical care was sufficiently serious. First, if someone has not eaten for six days and is then discouraged from seeking medical care, "a reasonable doctor or patient would find [it] important and worthy of comment." *Salahuddin*, 467 F.3d at 280. Second, the Court can draw the reasonable inference that Pineda's "extreme hunger, weakness, dizziness, and weight loss," along with his emotional distress, "significantly affect[ed] [his] daily activities." *Id.*; AC ¶¶ 33–34. And third, the Court can reasonably infer that these medical conditions caused Pineda chronic and substantial pain. *See Salahuddin*, 467 F.3d at 280. Pineda thus satisfies the objective element of his medical indifference claim.

Pineda also demonstrates that Arroyo and LaMonica acted with deliberate indifference—meeting the subjective element of his medical indifference claim. Just as they did with Pineda's food deprivation claim, both Arroyo and LaMonica knew of and disregarded the excessive risks to Plaintiff's health and safety in the medical context, as well, or recklessly failed to act with reasonable care to mitigate those risks once they knew about them. *See* AC ¶¶ 27, 31, 47–48. Both Arroyo and LaMonica knew that Pineda was suffering but actively chose to not do anything to help alleviate his symptoms; in fact, they tried to make them worse. *See id.* Arroyo's alleged statement that he "would love to see [Pineda's] health take a downhill turn and to be the one responsible" could not be much more clear. AC ¶ 27.

17

Defendants push back by highlighting that Pineda did, in fact, receive medical care. MTD at 11. But their argument misses the point. Pineda does not dispute that he received an appointment with a nurse on or about May 11, 2025, once he began to experience physical symptoms and requested medical attention. AC ¶¶ 23–24. Indeed, at that check-up, the nurse relayed to Arroyo and LaMonica that Pineda needed to be served kosher food. *Id.* ¶¶ 25, 27. Instead, Pineda's argument turns on his allegations that *subsequent* to his May 11 evaluation, he never received any medical care—because *at* that very evaluation, Arroyo allegedly stated that he would love to see Pineda's health decline. AC ¶ 27. LaMonica, meanwhile, continued to discourage other jail officials from working to alleviate Pineda's health problems following that appointment. *Id.* ¶ 31. In other words, that Pineda received an appointment with a nurse is not the point; it is that Arroyo and LaMonica learned about the excessive risks Pineda faced to his health and safety at that very check-up—then allegedly chose to disregard them. *See* AC ¶¶ 27, 31, 47–48; *Vega*, 963 F.3d at 273.

Accordingly, Plaintiff's medical indifference claim also survives Defendants' motion to dismiss.

## IV.   Pineda Fails to Establish *Monell* Liability

Next, the Court evaluates Pineda's claim for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). AC ¶¶ 51–56. A claim for municipal liability under Section 1983 requires a plaintiff to "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

18

> (1) [A] formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).

Moreover, a plaintiff must establish a causal link between the municipality's policy, custom or practice and the alleged constitutional injury. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue.").

Here, Pineda's conclusory argument that the "constitutional violations suffered by Plaintiff resulted from policies, customs, or practices of Dutchess County and the Sheriff's Office" is plainly insufficient to state a claim for municipal liability under *Monell*. AC ¶ 53. Pineda pleads no other facts to support this broad, vague allegation. *See generally* AC. Because a "'general and conclusory allegation' of a municipal policy or custom fails to state a facially plausible *Monell* claim," Pineda's municipal liability claim is dismissed with prejudice. *Valdiviezo v. Boyer*, 752 F. App'x 29, 31 (2d Cir. 2018) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015); *see infra* Section VII (denying leave to amend).

19

**V.     Pineda Alleges Sufficient Facts to Demonstrate That Arroyo and LaMonica, Not Imperati, Were Personally Involved in the Alleged Violations**

Defendants next assert two additional affirmative defenses. First, Defendants argue that Pineda's claims against the Individual Defendants must fail because those Defendants—Officer Arroyo, Sergeant LaMonica, and Sheriff Imperati—were not personally involved in the constitutional violations Pineda alleges. MTD at 15–17. "To state a claim for damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that defendants were personally or directly involved in the violation[.]" *Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013) (collecting cases).

To establish such liability, Pineda must show that each "defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). A plaintiff may establish personal involvement by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (2d Cir. 2013) (cleaned up).

In the context of Section 1983 supervisory claims, a plaintiff "must demonstrate both that the defendant was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the defendant also drew the inference.'" *Elting v. Lassiter*, No. 22-CV-8573 (PGG), 2023 WL 8699454, at *5 (S.D.N.Y. Dec. 14, 2023) (quoting *Tangreti*, 983

20

F.3d at 619) (cleaned up). "Individual liability under § 1983 may not be based on a theory of *respondeat superior* or vicarious liability." *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 266 (S.D.N.Y. 2014) (citations omitted).

Here, Pineda seeks punitive damages against Officer Arroyo and Sergeant LaMonica in their individual capacities, as well as general compensatory damages. AC at 10. And he pleads sufficient facts to demonstrate that both Arroyo and LaMonica were personally involved in the alleged constitutional violations at issue. Arroyo, for his part, told Pineda during a medical evaluation that he "would love to see [Pineda's] health take a downhill turn and to be the one responsible." AC ¶ 27. LaMonica, meanwhile, was present for the same medical evaluation and discouraged another jail official from trying to source kosher meals for Pineda—implying that such a solution "would not be supported." *Id.* ¶ 31.

Even if the Court were to assume that the defendants did not "participate[] directly in the alleged constitutional violation[s]," which it does not, Pineda pleads enough facts to sufficiently demonstrate that Arroyo and LaMonica both "failed to remedy the wrong" after being informed of the alleged violations or "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Grullon*, 720 F.3d at 139. Therefore, both Arroyo and LaMonica were sufficiently personally involved in the alleged violations for Pineda to seek damages from them under Section 1983.

By contrast, Pineda alleges no facts to demonstrate that Sheriff Imperati was personally involved in the constitutional violations he alleges. Pineda only asserts that Imperati was "ultimately responsible for the operation, policies, and personnel of the Dutchess County Jail," AC ¶ 9, and that Imperati was deliberately indifferent to the "systemic failures" that caused Pineda's injuries. *Id.* ¶ 56. Pineda does not demonstrate that Imperati was "aware of facts from

which the inference could be drawn that a substantial risk of serious harm existed" or that Imperati "drew the inference." *Tangreti*, 983 F.3d at 619. Because "[i]ndividual liability under § 1983 may not be based on a theory of *respondeat superior* or vicarious liability," *Lloyd*, 43 F. Supp. 3d at 266, Pineda cannot demonstrate that Imperati was liable merely because he was "ultimately responsible" for what happened at the Dutchess County Jail, AC ¶ 9.

Accordingly, to the extent Pineda seeks compensatory damages from Sheriff Imperati, those claims are also dismissed with prejudice.

## VI.    Neither Arroyo nor LaMonica Are Entitled to Qualified Immunity

With Pineda's claims against Imperati dismissed, the Court next assesses Defendants' contention that Arroyo and LaMonica are entitled to qualified immunity. MTD at 17–18. "[Q]ualified immunity shields federal and state officials from money damages unless the plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022), *cert. dismissed*, 143 S. Ct. 2694 (2023) (quoting *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)) (cleaned up).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Vega*, 963 F.3d at 274 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This doctrine prevents officials from lacking a "fair warning that his or her actions were unlawful." *Id.* (quoting *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014)); *see also Hurd v. Fredenburgh*, 984 F.3d 1075, 1089 (2d Cir. 2021) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009)) ("The principle of qualified immunity ensures that before they are subjected to suit, officers are

22

on notice their conduct is unlawful."). Courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law" to determine whether that officer is entitled to qualified immunity. *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Terebesi*, 764 F.3d at 231), *abrogated on other grounds by Case v. Montana*, 146 S. Ct. 500 (2026).

Because qualified immunity is an affirmative defense, the defendant bears the burden of proof. *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012). Courts are "sensitive to the notion that qualified immunity should be resolved 'at the earliest possible stage in the litigation.'" *Tanvir v. Tanzin*, 894 F.3d 449, 472 (2d Cir. 2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). At the same time, "as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion." *Chamberlain Est.*, 960 F.3d at 110 (cleaned up). Instead, "qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker*, 717 F.3d at 130 (citation omitted).

A defendant asserting a qualified immunity defense at this pre-discovery phase thus faces a "formidable hurdle." *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). The facts supporting the defense must appear on the face of the complaint and a court will grant a motion to dismiss only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* at 436. When addressing qualified immunity in advance of full merits discovery, "the question to be answered is whether a reasonable government officer, confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *In re New York*

23

*City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 412 (S.D.N.Y. 2021).

In answering that question, "plaintiffs are entitled to all reasonable inferences from the facts

alleged, not only those that support their claim, but also those that defeat the immunity defense."

*Sabir*, 52 F.4th at 64 (internal citation and quotation marks omitted).

Assuming without deciding that Arroyo and LaMonica violated a constitutional right, *see*

*supra* Sections II and III, the Court turns to whether "the right[s] at issue [were] clearly

established at the time of the challenged conduct," *Sabir*, 52 F.4th at 63 (cleaned up). Pineda's

First Amendment right to freely exercise his religion was clearly established at the time of the

alleged infractions. The Second Circuit has long made clear: "to deny prison inmates the

provision of food that satisfies the dictates of their faith *does* unconstitutionally burden their free

exercise rights." *McEachin*, 357 F.3d at 203 (emphasis added) (citing *Ford*, 352 F.3d at 597

(holding that prisoners have a "clearly established" right "to a diet consistent with [their]

religious scruples"); *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) (per curiam) (reaffirming

*Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975) (finding that an Orthodox Jewish rabbi had

a right to the provision of kosher meals while confined))); *see also Jackson v. Mann*, 196 F.3d

316, 321 (2d Cir. 1999) (denying qualified immunity to prison officials who refused an inmate's

requests for a kosher diet consistent with his religious beliefs).

Pineda's constitutional protections against jail officials' deliberate indifference to his

medical needs, meanwhile, were just as clearly established at the time of the alleged violations.

As noted above, the Supreme Court has left no doubt that "deliberate indifference to serious

medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed

by the Eighth Amendment[,] . . . whether the indifference is manifested by prison doctors in their

response to the prisoner's needs or by prison guards in intentionally denying or delaying access

24

to medical care.'" *Darby*, 14 F.4th at 128 (quoting *Estelle*, 429 U.S. at 104–05). That has long been the law: "A prisoner's Eighth Amendment right to be free from deliberate indifference to his serious medical needs is quite clearly established and has been for some time." *Benjamin v. Schwartz*, 299 F. Supp. 2d 196, 201 (S.D.N.Y. 2004), *aff'd sub nom. Benjamin v. Koeningsmann*, 204 F. App'x 979 (2d Cir. 2006); *see also Darnell*, 849 F.3d at 29 (same as to Fourteenth Amendment rights for individuals detained pretrial). Cases from the Second Circuit, cited above in Section III(A), have also long established an incarcerated individual's right to adequate nutrition.

Taking the facts in the Amended Complaint as true and making all inferences in Plaintiff's favor, then, "[e]very reasonable official would have understood that" depriving Pineda of kosher meals and ignoring the attendant medical consequences of that decision—including Arroyo admitting that he "would love to see [Pineda's] health take a downhill turn and to be the one responsible"—violated Pineda's clearly established constitutional rights. *Vega*, 963 F.3d at 274 (quoting *al-Kidd*, 563 U.S. at 741); AC ¶ 27. In other words, at this stage, the Court can readily conclude that both Arroyo and LaMonica were "on notice" that their conduct was unlawful, *Okin*, 577 F.3d at 433, and neither have cleared the "formidable hurdle" before them, *McKenna*, 386 F.3d at 434. As the Court has explained, *see supra* Sections II and III, it is not "beyond doubt that [Pineda] can prove no set of facts in support of his claim that would entitle him to relief," *McKenna*, 386 F.3d at 436 (internal citation omitted). Accordingly, neither Arroyo nor LaMonica are entitled to qualified immunity.

## VII.    The Court Denies Leave to Amend

Finally, the Court *sua sponte* denies Pineda leave to amend the claims against the County and Sheriff Imperati that are insufficiently pled. "Leave to amend, though liberally granted, may

25

properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, further amendment would be futile. Pineda has not sought to amend his claims and has identified no facts that would alter the Court's outcome. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (stating that requests to replead should be denied when "[t]he problem with [the pleading] is substantive" and "better pleading will not cure it"). Additionally, Pineda has already filed an Amended Complaint once in response to Defendants' earlier motion to dismiss. AC; *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend"). He was therefore on notice of the deficiencies in his complaint but failed to add sufficient allegations to address them. Therefore, the Court denies Pineda leave to amend the dismissed claims.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's First Amendment Free Exercise claim survives. *See supra* Section II. So, too, do his deliberate indifference claims under either the Eighth or Fourteenth Amendment. *See supra* Section III. Plaintiff's conclusory claim against the County under *Monell*, however, is dismissed with prejudice. *See supra* Section IV. And the Court concludes that Plaintiff has failed to plead facts establishing Imperati's personal involvement in any of the violations he alleges. *See supra* Section V. Accordingly, all of Plaintiff's claims against Dutchess County and Sherriff Imperati are dismissed with prejudice. *See supra* Sections IV, V. All other claims survive.

By separate order, the Court refers the parties to Magistrate Judge Reznik for general pretrial management.

The Clerk of Court is respectfully directed to terminate ECF No. 20 and to terminate Defendants Dutchess County and Sheriff Kirk Imperati.

Dated:  March 30, 2026
        White Plains, New York

                                    SO ORDERED.

                                    *Jessica Clarke*
                                    _____

                                    JESSICA G. L. CLARKE
                                    United States District Judge

27